**Sidney COHEN et al., Plaintiffs,**

v.

**John L. DADDONA, Sr. et al., Defendants.**

**No. CIV. A. 97–6568.**

United States District Court, E.D. Pennsylvania.

Nov. 29, 1999.

Nina E. Perris, Philadelphia, PA, for Sidney Cohen, T.V. Support Services, Inc., Summit House Associates, Sidney Cohen, General Partner of Summit House Associates, Tudor Development Group, Inc., General Partner of Green Hill Associates, L.P., Plaintiffs.

James L. Heidecker, Jr., for Allentown, Pa, for John L. Daddona, Sr.

James L. Heidecker, Jr., Allentown, PA, David L. Bargeron, Law Offices of David L. Bargeron, Allentown, PA, for Judy A. Daddona, John L. Daddona, Jr., Frank F. Daddona, Katherine Daddona, Donald A. Daddona, Eve Daddona, Lehigh Investments, Inc., Edward Reybitz.

John P. Karoly, Karoly Law Offices, P.C., Allentown, PA, David L. Bargeron, Law Offices of David L. Bargeron, Allentown, PA, for Dino Daddona, D.G. Holding, Inc., Design Associates, Inc.

John P. Karoly, Karoly Law Offices, P.C., Allentown, PA, James L. Heidecker, Jr., Allentown, PA, David L. Bargeron, Law Offices of David L. Bargeron, Allentown, PA, for J & D Brothers.

David L. Bargeron, Law Offices of David L. Bargeron, Allentown, PA, for Daniel J. Culnen, Culnen and Daddona Partnerships, Cul–Dadd Development Corp., American General Associates, Dadd Partners, the Dadd Group, Dadd Partnership, Caribbean Cable Programming, Inc., Francis Swirble, Ian Carvalho, Harry Legall, Cable T.V. Support Services, Inc.

Charles J. Hair, Allentown, PA, David L. Bargeron, Law Offices of David L. Bargeron, Allentown, PA, for Charles Hair, Hair & Jordan.

Jeffrey B. Albert, Mc Kissock and Hoffman, P.C., Philadelphia, PA, David L. Bargeron, Law Offices of David L. Bargeron, Allentown, PA, Robert D. Shapiro, Mc Kissock & Hoffman, Philadelphia, PA, for Frank J. Passarella.

Gerald E. Arth, Deborah R. Popky, Robert S. Tintner, Fox, Rothschild, Obrien & Frankel, LLP, Philadelphia, PA, David L. Bargeron, Law Offices of David L. Bargeron, Allentown, PA, for Mitchell R. Leiderman.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

### I. BACKGROUND

On October 23, 1997, plaintiffs filed a complaint charging defendants with racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964, as well as asserting various state law cause of action against numerous defendants. By an Order dated January 27, 1999, this court dismissed as time barred all of plaintiffs' state law claims governed by a two year statute of limitations, but allowed plaintiffs' state law claims governed by a four year statute of limitations, as well as plaintiffs' civil RICO claims to proceed. *See* doc. no. 62. After directing plaintiffs to file a RICO case statement as to each defendant, this court permitted the parties to conduct discovery solely on the issue of whether plaintiffs' civil RICO claim is time barred by the applicable statute of limitations. Before the court are defendants' motions for summary judgment on grounds that plaintiffs' civil RICO claims are time barred. For the reasons stated below, this court will grant defendants' motions.

### II. FACTS

The following facts are undisputed, or if disputed, are construed in the light most favorable to plaintiffs. Plaintiffs allege RICO claims against all defendants arising from what plaintiffs describe as three distinct schemes or sub-plots, all of which have defendant John L. Daddona, Sr.

("Daddona") as the main force orchestrating the various schemes in an effort to financially destroy and devastate plaintiffs. From 1987 through the present, plaintiffs allege that Daddona orchestrated, controlled, organized and manipulated the "enterprise" and the various defendants named in the complaint causing plaintiffs, and in particular plaintiff Sidney Cohen ("Cohen") million dollars in losses. The three basic schemes identified by plaintiffs overlap in time and according to plaintiffs at least one is still on going. The first scheme, identified as the "Summit House" scheme began in 1988 and continued into 1999 with the recent foreclosure on land owned by some of the plaintiffs. The second scheme, identified as the "Green Hill Project" scheme began in 1987 and continued until December 1993. The third scheme, identified as the "Caribbean Cable" scheme, began in 1986 and continues to the present time.

### A. *The Summit House Scheme.*

In the mid–1980's, plaintiff Summit House Associates ("Summit House"), a Cohen owned business entity, joined with Cohen and plaintiff Tudor Investment Group, Inc. ("Tudor") to form Green Hill Associates, L.P. ("Green Hill"), an entity formed for the purpose of developing residential apartments. Green Hill hired Eastern Consolidated Utilities, Inc. ("ECUI"), a Daddona owned entity,[1] to complete the site work on the project with the requirement that ECUI obtain a performance bond. ECUI, through defendant Daddona, contacted defendant Daniel J. Culnen ("Culnen"), an insurance broker, to obtain a performance bond in the amount of $790,000. Ultimately, Green Hill's general contractor was unable to complete the project, forcing Green Hill to settle with its lenders.

Following the failure of the Green Hill project, on March 29, 1988, Summit House and Green Hill entered into an agreement with ECUI whereby they agreed to pay ECUI approximately $225,000 for construction services provided on the Green Hill project. Plaintiff Summit House also agreed to pay $325,000 to ECUI for additional services performed on the project by ECUI. On March 31, 1988, Summit House signed a note, which was secured by a mortgage on approximately twelve acres of land owned by Summit House ("the Summit House property"), in favor of ECUI in that amount. ECUI subsequently assigned the note and mortgage to Tobias Knoblauch Private Bank ("Tobias Bank") as security for a loan.

In early 1990, Summit House failed to make the payment due under the note. As a result, on May 2, 1990, Summit House and ECUI entered into an agreement ("First May 1990 agreement") whereby Summit House agreed to execute a deed (the "First Deed") for the Summit House property in lieu of ECUI's foreclosure on the note and mortgage. The parties also entered into a second agreement on that day ("Second May 1990 agreement"), which involved the development of the Summit House property. The Second May 1990 agreement provided that Cohen was to receive funds from ECUI's refinancing of the Summit House property, in exchange for his services as a consultant. Specifically, ECUI agreed to obtain financing, in an amount in excess of $675,000, for the purchase of the Summit House property and to pay $240,000, plus 50% of the development rights to the land to Cohen. Both the First and Second May 1990 agreements were prepared by defendant Mitchell R. Leiderman, Esq. ("Leiderman"), who was Cohen's lawyer at the time. Daddona and ECUI were represented by defendant Charles Hair, Esq. ("Hair"). On the same day both agree-

---

**1.** John L. Daddona Sr. was the president of ECUI. Defendants, Donald A. Daddona, Frank F. Daddona, Judy A. Daddona, Eve Daddona, Katherine Daddona, and Edward Reybitz, II (collectively the "Daddona defendants") were either officers, stockholders or somehow involved with ECUI and other Daddona entities named in the complaint.

ments were entered, May 2, 1990, Daddona sold the Summit House property to Newland, Inc. ("Newland"), a Daddona entity and ECUI's nominee under the First Deed agreed to in the First May 1990 Agreement.

On May 4, 1990, Tobias Bank entered judgment against Summit House on the note assigned by ECUI to the bank as collateral for a loan. On May 18, 1990, defendant Leiderman wrote to Cohen requesting that he sign a judgment note in favor of Tobias in order to facilitate Newland's effort to obtain a purchase money loan for the Summit House property. Acting on Leiderman's advice, Cohen signed a judgment note.[2]

Subsequently, in early June of 1990, Hair requested Cohen to re-execute the First Deed to the property previously transferred to Newland. After consulting with his attorney Leiderman, Summit House through Cohen executed a deed (the "Second Deed") in favor of Newland on June 25, 1990. The Second Deed was not recorded until December 11, 1991.

Also in December of 1991, Newland obtained a loan from Tobias Bank, secured by the Summit House property. In violation of the Second May 1990 agreement, however, the original mortgage in favor of ECUI, which was subsequently assigned to Tobias Bank, was not paid off from the proceeds of this new loan nor was Cohen given any proceeds from the loan. As a result, judgment on the note secured by the mortgage was entered against Summit House. On February 21, 1991, in a letter sent to Leiderman, Cohen acknowledged that judgment had been entered on the note and asked Leiderman what he intended to do to resolve the matter.

On August 26, 1993, Cohen's new attorney, C. William Watts, Esq. ("Watts") sent a letter to ECUI and Newland in which Watts demanded an accounting and payment under the terms of the Second May 1990 agreement. Watts threatened legal action against ECUI, Newland and Daddona if payment was not made. No payment was made at that time nor was any legal action instituted.

### B. *The Green Hill Project Scheme.*

Plaintiffs also allege a civil RICO claim arising from the handling of the numerous lawsuits that resulted from the failure of the Green Hill project. As previously mentioned, in the mid–1980's, plaintiffs Cohen, Tudor, and Summit House formed Green Hill with the purpose of developing residential apartments. ECUI, who Green Hill hired to complete the site work on the project, was responsible for obtaining a performance bond. ECUI obtained a $790,000 performance bond from Wausau Insurance Company ("Wausau") through Culnen and his insurance agency Culnen & Hamilton. Plaintiff Tudor subsequently assigned to Dauphin Bank ("Dauphin"), the performance bond issued by Wausau in exchange for a $1 million line of credit. When the Green Hill project failed, Tudor ultimately defaulted on its obligations to Dauphin, who thereafter sued plaintiffs on the bond.

Wausau defended on the grounds that the bond it issued was not assignable. Defendant Leiderman defended both Cohen's and Daddona's interests in this litigation. Although originally Leiderman solely represented plaintiffs, in 1988, after the Green Hill project collapsed, Leiderman also began to represent Daddona and the various Daddona entities in litigation commenced by the subcontractors that worked on the Green Hill project in which both Cohen and Daddona were defendants. In connection with the Dauphin litigation, Leiderman advised plaintiffs in writing of the

---

**2.** Defendant Leiderman also informed Cohen, by telephone, that Daddona and ECUI would not be able to pay him the amount owed under the Second May 1990 agreement ($240,000) unless Cohen signed the judgment note. This would allow defendants Daddona and ECUI to obtain a mortgage, pay off the first loan and then pay Cohen the money owed to him.

potential conflict of interest inherent in this situation and plaintiffs consented to the dual representation.[3] Leiderman represented both plaintiffs and Daddona in the Dauphin litigation until July 30, 1991 when plaintiff terminated him.[4] However, Leiderman continued to represent Daddona in the Dauphin litigation.

During the course of the Dauphin litigation, plaintiffs allege as part of the pattern of racketeering activity, defendants Leiderman, Daddona and Hair failed to inform plaintiffs of two very important facts which caused plaintiffs significant damages. First, plaintiffs claim that they were not informed that the court had denied Wausau's motion for summary judgment based on the non-assignability of the bond.[5] Plaintiffs' claim that if they had knowledge of this decision, they would not have entered into a later agreement to settle all claims with Dauphin. Second, plaintiffs were unaware that the Daddona defendants had agreed under the bond to indemnify Wausau against any cost, loss or expenses.[6] Plaintiffs claim that despite this knowledge, Leiderman continued to improperly bill plaintiffs for the costs of defending the Dauphin action.

After years of litigation, Cohen agreed in April of 1993 to pay $50,000 to Dauphin to settle its claims.[7] This settlement, which was part of a larger agreement entered into between Cohen, Daddona and Culnen on April 21, 1993, occurred just prior to the sentencing of those individuals for their criminal conduct in connection with the Green Hill project.[8] On April 21, 1993, Cohen agreed to release approximately $700,000 from the Middle District of Pennsylvania's court registry, the bulk of which ($540,000) was used to pay restitution to the victims of their criminal conduct. Of the remaining money, $50,000 was paid to Cohen, who immediately paid it over to Dauphin to settle the bank's claims against Cohen and Daddona in that case.[9]

In exchange for Cohen's release of those funds, Culnen and Daddona agreed to pay Cohen $300,000, with $60,000 due on April 21, 1993 and the remainder in installments over the next thirty six months with $6,667.67 due on the first of each month thereafter beginning on June 1, 1993. The obligation was guaranteed by Culnen & Hamilton and ECUI. The agreement was developed and negotiated by defendant Frank J. Passarella, Esq. ("Passarella"), Culnen and Culnen & Hamilton's attorney.

Although Daddona and Culnen made the initial payment of $60,000 as well as the first installment in June of 1993, no further payment on the obligation was made by either individual. Cohen asserts that defendants Passarella, Daddona and Culnen knew at the time that they entered into the agreement with Cohen that they were

---

3. Leiderman also explained that if a conflict did arise, he would drop his representation of Daddona and their company, ECUI.

4. In October of 1991, Cohen's new lawyer, Alan Turner, Esq., assumed the representation from Leiderman in the Dauphin litigation.

5. The court denied the motion in early 1991. Although the court concluded that summary judgment was not appropriate on the issue of whether the bond was not assignable, there is no evidence that the court found that the bond was in fact assignable.

6. On December 3, 1991, Hair faxed Leiderman a letter which outlined the Daddona

defendants' agreement to indemnify Wausau against any and all costs and expenses.

7. At the time of the April 1993 settlement, Cohen was represented by yet another attorney, Francis Recchuiti, Esq. ("Recchuiti").

8. Cohen, Daddona and Culnen were convicted in federal court of fabricating a three million dollar bond that was issued to Daddona and ECUI so ECUI could act as the contractor on the Green Hill project. With the hope of receiving a reduced sentence from the federal judge, they decide to make restitution to the victims of the crime.

9. Another $10,000 was paid to Cohen which he then used to pay his attorney Recchuiti.

never going to pay Cohen this money owned under the agreement.[10]

### C. *The Caribbean Cable Scheme.*

The final civil RICO claim plaintiffs allege arises from their efforts to capitalize on the growing interest in cable television in the Caribbean, in particular, in Trinidad. In 1986, Cohen became interested in investing in the cable television industry in the Caribbean. Subsequently, in March of 1990, Cohen, defendant JLD, a Daddona entity, and others formed a Trinidadian corporation, Rainbow Cable Vision, Ltd. ("Rainbow"). Cohen and JLD owned 49% of Rainbow stock, with some stock reserved for future purchase by Cohen and JLD. On March 26, 1991, Cohen and Daddona formed a Pennsylvania corporation, Cable T.V. Support Services ("CTVSS"). They each owned 45% of the shares in CTVSS, which purpose was to buy and sell programming for distribution by Rainbow. Cohen paid for the formation of CTVSS, which was done by defendant Hair. Attorney Hair incorporated CTVSS, but failed to give Cohen any position in the company and failed to issue him any stock despite instructions to do so. In addition, although CTVSS had been incorporated, no other steps had been taken to organize it. By April 1992, the only official business conducted by CTVSS was to provide $80,000 in financing to Rainbow.

Armed with the knowledge of these failures and under the belief that he was being improperly cut out of his share of the lucrative cable industry in the Caribbean, Cohen sought to postpone a meeting of the Board of Directors of Rainbow scheduled to take place on May 5, 1992.[11] In fact, Cohen had become so concerned with the problems associated with CTVSS, he formed another company, plaintiff T.V. Support Services, Inc. ("TVSS"), to obtain programing for Rainbow to distribute in Trinidad. In this same time period, around May 25, 1992, unknown to Cohen, Daddona, assisted by Leiderman, formed CCP for a similar purpose of buying and selling programing exclusively for Rainbow. On May 25, 1992, CCP and Rainbow entered into an agreement whereby CCP would become the exclusive provider of cable programming to Rainbow, rather than CTVSS or TVSS. After Cohen become aware of this agreement between Rainbow and CCP, he sent a letter to the Managing Director of Rainbow on August 20, 1992, outlining each instance in which Daddona and the Daddona defendants failed to satisfy their obligations to Cohen.

In June of 1992, Leiderman contacted counsel for Cohen regarding the possible sale of Cohen's share in Rainbow. However, when Cohen asked to see the financial statement for Rainbow, nobody was willing to supply this information and in fact, some of the defendants blocked this information from being released to Cohen. The sale never took place and Cohen remained a shareholder in Rainbow.

When Cohen would not sell his shares in Rainbow, Daddona, with the help of Leiderman called an extraordinary meeting of the Board in November of 1993 to discuss large debts owned by Rainbow to various entities. The largest debt, which plaintiffs allege were all false and fabricated, was owed to defendant J & D Brothers in the amount of approximately $608,000. Although Cohen objected to the meeting and the payment of these debts, the meeting was held on February 22, 1994. At the meeting which Cohen did not attend, additional shares in Rainbow were issued, with most of the new shares going to Daddona and J & D Brothers. This share allocation effectively put Daddona and J & D Broth-

---

**10.** During these negotiations, Cohen was again represented by Recchuiti.

**11.** Cohen, although a shareholder in Rainbow, did not receive advance notice of the meeting. At the meeting, Rainbow's Board was to decide which company to use as the supplier of programing. The meeting was not continued and Rainbow decided to retain Caribbean Cable Programming, Inc. ("CCP"), a Daddona entity.

ers in control of Rainbow, at the expense of Cohen. In addition, notwithstanding Rainbow's alleged profitability, Cohen has never received dividends or profits from his share.

## III. LEGAL STANDARD

Summary judgment is appropriate if the moving party can "show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Court must accept the non-movant's version of the facts as true, and resolve conflicts in the non-movant's favor. *Big Apple BMW, Inc. v. BMW of N. America, Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied*, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

The moving party bears the initial burden of demonstrating the absence of genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has done so, however, the non-moving party cannot rest on its pleadings. *See* Fed.R.Civ.P. 56(e). Rather, the non-movant must then "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." *Harter v. GAF Corp.*, 967 F.2d 846, 852 (3d Cir.1992); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## IV. APPLICABLE LAW

■ Civil Rico claims are subject to a four-year statute of limitations. *Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). Therefore, the sole question presented here is whether plaintiffs' claims accrued more than four years before they filed suit on October 23, 1997—that is, before October 23, 1993.

■ Generally, a claim "accrues in a federal cause of action as soon as a potential claimant either is aware, or should be aware, of the existence of and source of injury, not when the potential claimant knows or should know that the injury constitutes a legal wrong." *Keystone Ins. Co. v. Houghton*, 863 F.2d 1125, 1127 (3d Cir. 1988), *abrogated by, Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997).[12] "Given the unique elements required for a RICO claim, awareness that *each element* comprising a RICO claim is present is crucial ...." *Id.* at 1128 (emphasis in original). Thus, "[u]nder the [Third Circuit's] 'injury and pattern discovery' rule, 'the limitations period starts to run when a plaintiff knew or should have known that the RICO claim (including a pattern of racketeering activity) existed.'" *Perlberger v. Perlberger*, No. 97–4105, 1998 WL 76310, at *5 (E.D.Pa. Feb.24, 1998) (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 117 S.Ct. 1984, 1991–92, 138 L.Ed.2d 373 (1997) (citation omitted)).

■ "The elements of a civil RICO cause of action are (1) the conducting of (2) an enterprise (3) through a pattern of (4) racketeering activity (5) causing plaintiffs

**12.** In *Klehr*, the Supreme Court invalidated the Third Circuit's last predicate act exception to the general discovery rule. However, the Supreme Court did not establish which of the remaining rules followed by the various Court of Appeals should be applied—the "pure injury" accrual rule, pursuant to which a claim accrues as soon as the plaintiff is injured, or "injury plus source plus pattern" accrual rule, pursuant to which a plaintiff must have notice of all elements of a RICO claim before the limitations period begins to run. Thus, this court "concludes that it remains the law of this Circuit that a civil RICO claim accrues when the plaintiff 'knew or should have known that the elements of a civil RICO cause of action existed.'" *Forbes v. Eagleson*, 19 F.Supp.2d 352, 357 (E.D.Pa.1998); *accord Perlberger v. Perlberger*, 1998 WL 76310 (E.D.Pa.1998).

injury in their property or business." *Forbes*, 19 F.Supp.2d. at 357 (*citing Alberici v. United States Government, Dept. of Justice*, 1992 WL 57922, *3 (E.D.Pa. Mar.16, 1992), *aff'd*, 980 F.2d 722 (3d Cir. 1992); *see also Keystone*, 863 F.2d at 1128; 18 U.S.C. §§ 1962, 1964). Therefore, "plaintiffs' claims accrued and the statute of limitations began to run when they discovered or should have discovered that defendants had possibly engaged in conduct constituting the alleged pattern of racketeering and that this conduct had possibly caused them injury. 'Awareness that each element comprising a RICO claim is present is crucial while cognizance of the legal implication of these facts, that is, that there is a civil RICO cause of action, is irrelevant.'" *Forbes*, 19 F.Supp.2d. at 357–58 (*quoting Keystone*, 863 F.2d at 1128).

## V. DISCUSSION

 It is clear from the description of the facts, that most of the events complained of in this case took place long before the applicable four year statute of limitations. Plaintiffs, however, argue that while they may have been aware that they were suffering major financial losses as a result of defendants' conduct in these various bad business deals they had entered into with them, they did not know they had a RICO claim before October 23, 1993, as all of the elements had not yet developed. Essentially, plaintiffs argue that although aware of the conduct, they did not understand the legal implication of these facts. However, plaintiffs' cognizance of the specific legal implication of the facts is irrelevant. In addition, an examination of the circumstances surrounding each scheme, as well as the conduct of plaintiffs' various attorneys show that plaintiffs knew or should have known of the existence of each element comprising their RICO claims alleged in their complaint well before October 23, 1993.

As for the Summit House scheme, plaintiffs should have been aware, by no later than August 1993, and most likely sooner, that defendants had possibly engaged in conduct constituting the alleged pattern of racketeering and that conduct had possibly caused them harm. In the Summit House scheme, plaintiffs allege that defendant Daddona, with the assistance of defendants Leiderman and Hair conspired to deprive plaintiffs of money and property by entering into a series of agreements, with plaintiffs and other entities, and thereafter manipulating those agreements to the plaintiffs detriment. As a result of such conduct, plaintiffs lost at least $240,000 and any future profits from the development of the Summit House property and suffered an entry of judgment against Summit House in excess of $412,000. In a letter dated August 26, 1993, Cohen's attorney at that time, Watts, outlined in detail the fraudulent conduct of Daddona and the other defendants that is at the very heart of defendants' alleged pattern of racketeering, as well fully described the resulting economic harm to Cohen, Summit House and Tudor. In fact, plaintiffs, in both the complaint and their RICO case statements, do not allege that any predicate act in connection with this scheme occurred after December 1991. Thus, all claims against all defendants based on the Summit House scheme are clearly timed barred.

Plaintiffs also knew or should have known of all the elements of the civil RICO claims arising from the Green Hill scheme before October 23, 1993. The Green Hill project scheme generally involved defendants Daddona, Leiderman, Hair, Passarella and Culnen conspiring to defraud and harm plaintiffs during the course of the various lawsuits that arose from the failure of the Green Hill project. More specifically, this scheme involved two distinct subplots. The first involved defendants Daddona, Hair and Leiderman's fraudulent conduct during the litigation with Dauphin over the bond obtained by ECUI. Plaintiffs allege that they suffered damages in the amount of the costs Cohen

expended in defending and eventually settling the lawsuit because defendants Daddona, Leiderman and Hair failed to inform plaintiffs that the state court had denied the insurance company's summary judgment motion and that Daddona had agreed to indemnify the insurance company in the litigation. The evidence shows that before October 23, 1993, plaintiffs learned of the state court's decision, that Leiderman represented the Daddona's conflicting interest in connection with the Dauphin litigation and that Daddona had agreed to indemnify the insurance company. Plaintiffs also knew or should have known the role each defendant played in this sub-plot as well as the damages that arose from the conduct. Additionally, plaintiffs do not allege that any predicate act in connection with this sub-plot of the Green Hill scheme occurred after April 1993. Because plaintiffs' knew or should have known of all of the elements of this sub-plot of the Green Hill scheme involving the Dauphin litigation and the resulting damages suffered by plaintiffs by sometime shortly after April 1993, this sub-plot is also time barred.

The elements of the second sub-plot of the Green Hill scheme involved defendants Daddona, Leiderman, Passarella and Culnen's actions in connection with their criminal case arising from the failed Green Hill project. Plaintiffs allege that these defendants convinced Cohen to release $700,000 in order to pay restitution to victims in the criminal case while all along never intending repay Cohen. However, the evidence again shows that another one of plaintiffs' attorney, Recchuiti, knew that defendants had defrauded plaintiffs and never intended to repay Cohen as early as July 1993. In a July 21, 1993 letter to Passarella, Recchuiti accused defendants of mail fraud in connection with the agreement to release the money to pay restitution to victims of their crime. Recchuiti subsequently withdrew as plaintiffs' attorney, but not before advising Cohen to hire a lawyer to sue the defendants involved in the transaction. In any event, even if plaintiffs did not fully understand the legal significance of the defendants' conduct at that time or appreciate the advice from their counsel, plaintiffs did hire another attorney to attempt to collect the money owed by defendants. As evidenced by a letter dated August 26, 1993, plaintiffs, through their new attorney Watts, thoroughly described the facts and circumstances which they now contend form the elements of the second sub-plot. In the August 26, 1993 letter, plaintiffs' new attorney stated that in his opinion there was a pattern of conduct by all defendants at the time of the negotiation of the agreements to release the funds and thereafter, designed to avoid payment of the obligations secured by the agreements.[13] Thus, because plaintiffs knew or should have known, by August 1993, of each element comprising this sub-plot of the RICO claim arising from the Green Hill project, this sub-plot is also time barred.

Plaintiffs' final RICO claim arising from the Caribbean Cable scheme is similarly time barred. In this scheme, plaintiffs allege that defendants Daddona, J & B Brothers, Leiderman, Hair, and JLD conspired to deprive plaintiffs of profits from Rainbow and CTVSS by: failing to satisfy promises regarding ownership interest in Rainbow and CTVSS; secretly executing an agreement with CCP to cut out CTVSS and Cohen from being the exclusive supplier of programing for Rainbow; and reduc-

---

13. Watts also sent a letter to Passarella on August 19, 1993 which warned Passarella that, unless guarantees for the agreement to release the $700,000 were forthcoming, a lawsuit would be initiated. According to Cohen, Passarella responded and informed Watts that Cohen was never going to be paid. In addition, Cohen testified that Watts unambiguously informed him in early October 1993 that because of the defendants' conduct surrounding the April 1993 agreement, he should seriously consider suing defendants. Thus, Cohen clearly knew or should have known after this October 1993 conversation with Watts that he had suffered damages as a result of defendants' conduct and pattern of racketeering.

ing Cohen's power as a shareholder of Rainbow. As a result of this pattern of racketeering, plaintiffs were deprived of any profits they were owed as shareholders in Rainbow or CTVSS. As evidenced again by correspondence prepared for Cohen in August of 1992, Cohen was aware of all the conduct complained of in connection with the Caribbean Cable scheme before October 23, 1993. In fact, when plaintiffs filed the identical lawsuit in federal court in 1995, which was dismissed without prejudice for failure to comply with court orders, see Cohen v. Daddona, No. 95–4110, 1996 WL 571754 (E.D. Pa. filed Sept. 30, 1996) (Rendell, J.) (order dismissing case), plaintiffs attached as support for its civil RICO claims filed in that suit, the same August 20, 1992 letter which described the defendants' conduct concerning the Caribbean Cable scheme. In that letter, plaintiffs indicated that they were ready to proceed against the defendants identified in this scheme for deceit, breach of fiduciary duty, and conspiracy. While they may not have fully understood in 1992 that such conduct could potentially result in a RICO cause of action, plaintiffs knew or should have known that defendants had possibly engaged in conduct constituting the alleged pattern of racketeering and that this conduct had possibly caused injury. Thus, any claim based upon the Caribbean Cable scheme is time barred.

While not disputing that they knew or should have known of each of defendants' conduct in these various schemes, plaintiffs asks this court to view the case in its totality. Plaintiffs assert that, although they knew they were suffering major financial losses due to the conduct of defendants which constitute the alleged pattern of racketeering in these various schemes, they could not fully appreciate the scope, duration and impact of such conduct and therefore were unaware of all the elements of the RICO action for two reasons. First, plaintiffs contend that they did not understand the full impact of defendants' schemes because they were still partners with defendant Daddona in many business deals that had potential to make money and believed they would eventually recover the money lost in all of these failed deals. Second, plaintiff Cohen asserts that all the elements were not known because Cohen was a long time friend and business partner of Daddona, thus, Cohen had no reason to believe that Daddona was at the center of all these schemes to financially ruin plaintiffs. Plaintiffs contend that these misguided beliefs were dispelled at some time in late October or early November of 1993 when they began to realize the scope, duration and impact of the conspiracy orchestrated by Daddona. In particular, plaintiffs point to information they received about some financial trouble of Rainbow as the crucial facts which finally alerted plaintiffs that Daddona, in concert with the other defendants were conspiring to financial ruin plaintiffs through all of these various schemes.[14] This suspicion was thereafter confirmed when plaintiffs hired another attorney, Stephen Axelrod, Esq. ("Axelrod"), to conduct an investiga-

14. On October 27, 1993, plaintiffs learned that a supplier of Rainbow was owed a large amount of money and was having a difficult time collecting its fees from Rainbow. On November 11, 1993, plaintiff Cohen received a letter from a bank which financed some of Rainbow's start-up fees, indicating that the loan was being recalled due to noncompliance with the terms of the loan. It is entirely unclear to the court why these two particular pieces of information regarding the Caribbean cable investment caused plaintiffs "great concern" when plaintiffs also knew the following facts at this time: Daddona had not given Cohen an equal partnership in the business despite a promise to do so; Hair had incorporated CTVSS but had not given Cohen any position in the company nor issued him any stock despite instructions to do so; clandestine meeting of the Rainbow board were being held over Cohen's objections; Cohen was being cut out of the cable industry through deals made by Daddona; Cohen was being denied access to financial records of Rainbow; and Cohen had never received dividends or profit from Rainbow despite being a shareholder. In addition, plaintiffs also knew that had lost a significant amount of money with Daddona in the two other schemes, Summit House and Green Hill.

tion into the circumstances surrounding these schemes and Axelrod informed them of their potential RICO claims in early 1994.

This totality argument, however, is unavailing as the undisputed facts show that all the elements of plaintiffs' RICO claims were in place before plaintiffs clearly realized their legal significance. The facts highlighted by plaintiffs do not add anything new to the three schemes that form the basis of their RICO causes of action. Contrary to plaintiffs' argument, these additional facts do not complete or fully develop the elements of the RICO claims. Defendants' conduct that constitute the alleged pattern of racketeering in this case were fully developed and known to plaintiffs before these additional facts were discovered. While these additional facts may have finally dispelled plaintiffs' misguided beliefs concerning his future financial prospects with Daddona or his personal relationship with Daddona, they do not toll the statute of limitations when plaintiffs knew or should have known of all the elements of their RICO claim by at least early October of 1993. Thus, this court will grant summary judgment in favor of all defendants on each of plaintiffs' civil RICO claims.

An appropriate order follows.

### ORDER

**AND NOW,** this **29th** day of **November, 1999,** upon consideration of defendant Frank J. Passarella's motion for summary judgment (doc. no. 103), defendant Charles J. Hair's motion for summary judgment (doc. no. 114), defendant Mitchell R. Leiderman's motion for summary judgment (doc. no. 115), defendants John L. Daddona, Sr., Judy A. Daddona, John L. Daddona, Jr., Frank F. Daddona, Katherine A. Daddona, Donald A. Daddona, Eve Daddona, Edward Reybitz, II, and Lehigh Investments, Inc.'s motion for summary judgment (doc. no. 117), defendants Dino Daddona, J & D Brothers, Inc., DG Holding, Inc. and Design Associates' motion for summary judgment (doc. no. 120), plaintiffs' responses thereto (doc. nos. 108, 121, 122 & 123) and following oral argument by counsel for the parties, it is hereby **ORDERED** as follows:

1. All of defendants' motions for summary judgment on statute of limitations grounds are **GRANTED;**

2. All plaintiffs' remaining state law claims (those governed by a four year statute of limitations) are **DISMISSED WITHOUT PREJUDICE;** [1] and

3. Defendants shall file any motions seeking sanctions within fifteen (15) days from the date of this Order.[2]

**AND IT IS SO ORDERED.**

---

1. Having granted summary judgment of plaintiffs' RICO claims, there is no independent basis for federal jurisdiction over the remaining state law claims. Therefore, the court will exercise its discretion under 28 U.S.C. § 1367(c)(3) and will decline supplemental jurisdiction over plaintiffs' state law claims.

2. The entry of judgment will be deferred until the court rules on any motions for sanctions.